HARRIET A. STEINER, Bar No. 109436
harriet.steiner@bbklaw.com
JOSHUA NELSON, Bar No. 260803
joshua.nelson@bbklaw.com
Best Best & Krieger LLP
500 Capitol Mall
Suite 1700
Sacramento, CA  95814
Telephone:  (916) 325-4000
Facsimile:  (916) 325-4010

Attorneys for Plaintiff
SACRAMENTO METROPOLITAN CABLE TELEVISION COMMISSION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO METROPOLITAN CABLE TELEVISION COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS MANAGEMENT, LCC, d/b/a COMCAST,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATION OF CAL. PUB. UTIL. CODE §§ 5840, 5860, 5870**<br><br>2. **BREACH OF CONTRACT**<br><br>3. **UNJUST ENRICHMENT**<br><br>4. **DECLARATORY RELIEF** |

Plaintiff the Sacramento Metropolitan Cable Television Commission ("SMCTC" or "Plaintiff"), hereby alleges against Defendant Comcast Cable Communications Management, LLC, d/b/a Comcast ("Comcast" or "Defendant"):

**NATURE OF THE ACTION**

1. This is an action brought under the Digital Infrastructure and Video Competition Act of 2006, Cal. Pub. Util. Code §§ 5800 et seq. ("DIVCA") to recover amounts wrongfully withheld by Defendant from Plaintiff which were required to be paid pursuant to Public Utilities Code §§ 5840, 5860 and 5870.

**PARTIES**

2. Plaintiff SMCTC, is a joint powers agency, existing under the laws of the state of California. SMCTC's member agencies are the County of Sacramento, and the cities of Sacramento, Citrus Heights, Folsom, Rancho Cordova, Elk Grove, and Galt, all of which are located within the County of Sacramento. SMCTC is a citizen of the state of California

3. Defendant Comcast Cable Communications Management, LLC is a Delaware limited liability company whose principal place of business is located in the City of Livermore, California. Defendant's sole member is Comcast Cable Communications LLC, which is a Delaware limited liability company. Comcast Holdings Corporation is the sole member of Comcast Cable Communications LLC. Comcast Holdings Corporation is a Pennsylvania corporation with its principal place of business in Pennsylvania. As such Defendant is a citizen of the state of Pennsylvania. Defendant operates as a "video service provider" under a state franchise issued pursuant to DIVCA.

4. Defendant is presently providing video services, under its state franchise to one or more residents within the jurisdictional limits of Plaintiff.

**JURISDICTION AND VENUE**

5. Pursuant to 28 U.S.C. § 1441(b), this Court has jurisdiction over any civil action between citizens of different states where the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Comcast Cable Communications LLC is a citizen of the state of Pennsylvania, and Plaintiff is a citizen of the state of California. Plaintiff is alleging damages of at least $530,310 as set forth in this Complaint.

7. This Court has personal jurisdiction over Defendant because its principal place of business is located within California. In addition, as a condition of obtaining its state franchise under DIVCA, Defendant agreed to accept service of process and submit to the jurisdiction of California courts.

8. Pursuant to 28 U.S.C. § 1391(b), this Court is the proper venue to hear this action because Defendant does substantial business in the County of Sacramento, and it is where

Defendant's obligations or liability arose or the breach occurred, giving rise to the claims set forth in this Complaint. As such, a substantial part of the events or omissions giving rise to the claim occurred within this Court.

## FACTUAL BACKGROUND

### Comcast's State Video Franchise

9. The Federal Cable Communications Policy Act of 1984 (the "Cable Act"), codified at 47 U.S.C. §521 et seq., requires every cable service provider to obtain a cable franchise from a state or local entity. Prior to January 1, 2007, California Government Code § 53066 authorized local entities to grant cable television franchises and regulate cable television systems and other video service providers, subject to some limitations. Thus, a company seeking authority to install facilities and equipment in public rights-of-way in California in order to provide cable or video services to the public was required to obtain a franchise from the pertinent local government (typically a city or county). However, that changed under DIVCA.

10. DIVCA became effective on January 1, 2007, and established a new scheme for franchising "video service providers." DIVCA was written so that it reached not only companies like Defendant that concede that they are "cable operators" subject to the Cable Act's requirements, but also companies that had contended they were not required to obtain a franchise under the Cable Act or the California Government Code.

11. DIVCA shifted the authority to grant video service franchises from local jurisdictions to the state. After January 1, 2007, entities seeking to enter a market for the first time must obtain a franchise from the state. Providers who had a local franchise prior to January 1, 2007, continue to operate under the local franchise until it expires or terminates in accordance with DIVCA or until a state-issued franchisee enters the market. The local franchises must then be replaced with state-issued franchises. The California Public Utilities Commission ("CPUC") is the agency responsible for issuing state franchises.

12. DIVCA, among other things, permits a state video service franchise holder to use valuable local public rights-of-way, and requires Plaintiffs to provide a state video franchise holder access to those rights-of-way under terms and conditions as described in the legislation.

1  For example, California Public Utilities Code § 5885(a) requires local entities, including
2  Plaintiffs, to allow "the holder of a state franchise" to "install, construct, and maintain a network
3  within public rights-of-way under the same time, place, and manner as the provisions governing
4  telephone corporations under applicable state and federal law, including, but not limited to, the
5  provisions of Section 7901.1."

6  13. In return, a state franchise holder must satisfy certain requirements established by
7  DIVCA, including the payment of franchise fees and public, education and government ("PEG")
8  channel fees as discussed below.

9  14. In order to obtain a state franchise, an applicant must submit a form to the state
10 containing a sworn affidavit in which it attests that it will pay all applicable franchise and PEG
11 fees and otherwise comply with DIVCA.

12 15. Under DIVCA, the CPUC must issue a franchise within fourteen (14) days if the
13 application submitted is complete. The CPUC does not investigate whether an applicant can
14 comply with the law or the accuracy of the statements contained in the application.

15 16. The franchise issued authorizes the Applicant to occupy the rights-of-way in its
16 service territory, and also authorizes it to provide video service. It is unlawful to provide service
17 without a franchise.

18 17. While the CPUC has responsibility for issuing franchises and for enforcing certain
19 of the DIVCA requirements, the CPUC has declared that local governments and the courts have
20 responsibility for enforcing PEG requirements and fees and the payment of franchise fees. In its
21 *Rulemaking for Adoption of a General Order, Procedures to Implement Digital Infrastructure,*
22 *Video Competition Act of 2006*, 2007 WL 725608, Cal.P.U.C., March 01, 2007, (NO. D.07-03-
23 014, R-06-10-005, ID 150794), the CPUC stated:

24 > DIVCA endows the Commission with authority to regulate franchising
25 > (§§ 5840 and 5950), antidiscrimination (§ 5890), reporting (§§ 5920
26 > and 5960), the prohibition on the use of rate increases for stand-alone,
27 > residential, primary line, basic telephone services to finance video
28 > deployment (§§ 5940 and 5950), and annual user fees (§ 401, §§ 440-
     > 444, § 5840). For other provisions, the Commission lacks explicit
     > regulatory authority. Localities are afforded the authority to regulate
     > collection and payment of franchise fees (§ 5860), PEG channel
     > requirements (§ 5870), the Emergency Alert System (§ 5880), and,

notably, federal and state customer service and protection standards (§ 5900).

18. On or about December 12, 2007, Defendant filed an "Application for a New or Amended California State Video Franchise" at the CPUC ("Franchise Application").

19. On or about January 2, 2008, the CPUC issued "California Video Franchise Certificate: Franchise Number: 0021" ("State Franchise") to Defendant Comcast.

20. Comcast was an incumbent cable provider within Plaintiff's jurisdiction. Under Public Utilities Code section 5840(o)(3), Comcast was able to transition from its existing local franchise to a state-wide franchise upon the entry of a statewide franchisee to Plaintiff's jurisdiction.

21. One or more statewide franchisees operate within Plaintiff's jurisdiction.

22. Plaintiff and its member agencies are included among the list of "Affected Local Entities" in Defendant's State Franchise, meaning that the State Franchise may include all or part of each Plaintiff's territory. At all times relevant to this Complaint, Comcast operated within Plaintiff's jurisdiction under its State Franchise.

### Franchise and PEG Fees

23. California Public Utilities Code § 5840(q) establishes a statewide franchise fee on the gross revenues of each franchisee payable as rent or a toll for the use of the public rights-of-way. This franchise fee is equal to five percent (5%) of gross revenues or the percentage applied by the local entity to the gross revenue of the incumbent cable operator, whichever is less. This franchise fee is payable to each local agency where the franchisee operates calculated based as the proportional share of the franchisee's gross revenue derived from the provision of video service within that jurisdiction. Cal. Pub. Util. Code § 5860(a).

24. The franchise fee is remitted to the local agency quarterly, within forty-five (45) days after the end of the quarter for that calendar quarter. Each payment must be accompanied by a summary explaining the basis for the calculation of the franchise fee. If the holder does not pay the franchise fee when due, the holder must pay a late payment charge at a rate per year equal to the highest prime lending rate during the period of delinquency, plus one percent (1%).

25. Each of Plaintiff's member agencies has adopted or authorized Plaintiff to adopt an ordinance establishing a five percent (5%) franchise fee as permitted by DIVCA. See Sacramento County Code § 5.50.977, Citrus Heights Municipal Code § 90-183, Elk Grove Municipal Code § 5.50.010, Folsom Municipal Code § 5.50.010, Galt Municipal Code § 5.55.030, Rancho Cordova Municipal Code § 5.75.800, Sacramento City Code §5.28.2670; see also Commission Resolution No. 07-011.

26. California Public Utilities Code § 5870(n) authorizes local agencies to establish PEG fees by ordinance. The PEG fee may not exceed three percent (3%) in the event that the agency imposed a PEG fee in excess of one percent (1%) as of December 31, 2006. Once the agency provides the franchisee with notice of the PEG fee, PEG fees are paid quarterly within forty-five (45) days after the end of the quarter for the preceding calendar quarter.

27. Plaintiff and its member agencies have imposed a one percent (1%) PEG fee as permitted by DIVCA. See Sacramento County Code § 5.50.977, Citrus Heights Municipal Code § 90-183, Elk Grove Municipal Code § 5.50.010, Folsom Municipal Code § 5.50.010, Galt Municipal Code § 5.55.030, Rancho Cordova Municipal Code § 5.75.800, Sacramento City Code § 5.28.2670; see also Commission Resolution No. 07-011.

28. Plaintiff is authorized to administer and enforce all DIVCA franchises within its member agencies, including collecting unpaid franchise and PEG fees. See Sacramento County Code § 5.50.977, Citrus Heights Municipal Code § 90-183, Elk Grove Municipal Code § 5.50.010, Folsom Municipal Code § 5.50.010, Galt Municipal Code § 5.55.030, Rancho Cordova Municipal Code § 5.75.800, Sacramento City Code §5.28.2670; see also Commission Resolution No. 07-011.

29. Defendant purportedly paid Plaintiff franchise and PEG fees for Calendar Years 2015-2016.

30. As permitted by DIVCA, Plaintiff conducted an audit of Calendar Years 2015-2016 payments (collectively, the "Audit"). This Audit determined that Comcast underpaid franchise and PEG fees by approximately $530,310, excluding late fees, interest and other

///

amounts owed.  A true and correct copy of the Audit is attached as Exhibit A and incorporated by this reference.

### FIRST CAUSE OF ACTION

### Violation of California Public Utilities Code §§ 5840, 5860, 5870

31. Plaintiffs refer to and incorporate, as though fully set forth herein, paragraphs 1 through 30, inclusive, of this Complaint.

32. Defendant underpaid Plaintiff franchise and PEG fees for Calendar Year 2015-2016.

33. This violates California Public Utilities Code §§ 5840, 5860, 5870.

34. Plaintiff is entitled to recover the exact amount underpaid by Defendant, currently estimated at $530,310, subject to proof at trial.  Plaintiff is also entitled to recover applicable late fees, interest and the cost of the Audit.

### SECOND CAUSE OF ACTION

### Breach of Contract

35. Plaintiffs refer to and incorporate, as though fully set forth herein, paragraphs 1 through 34, inclusive, of this Complaint.

36. Under California law, a statute may create rights giving rise to relied under contract or tort theories.

37. Plaintiff conferred a benefit on Defendant by permitting Defendant to install facilities in the rights-of-way pursuant to the DIVCA franchise.

38. Plaintiff is a specific beneficiary of the franchise fee and PEG fee provisions of DIVCA.

39. Defendant, as a condition of obtaining the state franchise swore to pay all applicable franchise and PEG fees as required by DIVCA.

40. Comcast thereby assumed a contractual obligation or a contractual obligation is implied in law to pay all applicable franchise and PEG fees.

41. Comcast has breached its duty to Plaintiff by failing to pay all applicable franchise and PEG fees owed for Calendar Years 2015-2016.

42. Plaintiff is entitled to recover damages for such underpayment.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

43. Plaintiffs refer to and incorporate, as though fully set forth herein, paragraphs 1 through 42, inclusive, of this Complaint.

44. Plaintiff through its member agencies has allowed Defendant to place facilities within the rights-of-way and provide video service pursuant to a DIVCA franchise.

45. Defendant failed to pay Plaintiff the total amount owed for such rights under DIVCA.

46. Accordingly, Plaintiff has not received sufficient value for such rights provided to Defendant, and Defendant has been unjustly enriched at Plaintiff's expense.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment – Violation of California Public Utility Code §§ 5840, 5860, 5870

### (By All Plaintiffs)

47. Plaintiffs refer to and incorporate, as though fully set forth herein, paragraphs 1 through 46, inclusive, of this Complaint.

48. Comcast has violated DIVCA by failing to pay all applicable franchise and PEG fees owed for Calendar Years 2015-2016.

49. As a result of Defendant's violations of California Public Utility Code §§ 5840, 5860, 5870, Plaintiff has been and continues to be harmed.

50. As such, there is an actual and present controversy between Plaintiff and Defendant.

51. Plaintiff is entitled to seek declaratory relief under California Code of Civil Procedure § 1060.

52. Further, the construction of a statute is the proper subject for declaratory relief. *See, e.g., Apartment Assn. of Los Angeles v. Los Angeles* (2006) 136 Cal.App.4th 119, 128 .

///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of judgment against Defendant as follows:

1. A declaration that Defendant is in violation of DIVCA, Cal. Pub. Util. Code §§ 5840, 5860, 5870;

2. All amounts owed Plaintiff for unpaid franchise and PEG fees for Calendar Years 2015-2016, including late fees, interest and costs of the Audit;

3. For damages in an amount to be determined at trial;

4. For costs of suit herein, including reasonable attorneys' fees; and

5. For such other and further relieve as the Court may deem just and proper.

Dated: May 11, 2018

BEST BEST & KRIEGER LLP

By: */s/ Harriet A. Steiner*
    HARRIET A. STEINER
    JOSHUA NELSON
    Attorneys for Plaintiff
    Sacramento Metropolitan Cable Television Commission

LAW OFFICES OF
BEST BEST & KRIEGER LLP
500 CAPITOL MALL, SUITE 1700
SACRAMENTO, CA 95814

82461.00007\31079924.4

- 9 -

COMPLAINT

# EXHIBIT A

**ASHPAUGH & SCULCO, CPAs, PLC**
Certified Public Accountants and Consultants

April 24, 2018

Robert Davison, Executive Director
Sacramento Metropolitan Cable TV Commission
799 G Street, 4th Floor
Sacramento, CA 95814

**Subject:   Review of Franchise and PEG Fees Paid by Comcast to the Sacramento Metropolitan Cable Television Commission, California**

Dear Mr. Davison:

Ashpaugh & Sculco, CPAs, PLC (A&S) was engaged by the Sacramento Metropolitan Cable Television Commission, California (SMCTC) to review the franchise and PEG fees paid by Comcast. Please find enclosed our findings for the review period of January 1, 2015 through December 31, 2016. To review the franchise and PEG fees paid by Comcast, A&S performed the Scope of Work included on page two of this letter report.

This letter report is intended solely for the information and use of the SMCTC, is not intended to be, and should not be used by anyone other than these specified parties. It is our opinion that the total amount due to the SMCTC from Comcast for underpayment of franchise fees, PEG fees, and interest charges, totals $588,636, as shown on page one of this letter report.

We appreciate the opportunity to be of service to you. If you have any questions, please let us know.

Sincerely,

**ASHPAUGH & SCULCO, CPAS, PLC**

*Ashpaugh & Sculco, CPAs, PLC*

ANALYSIS OF FRANCHISE & PEG FEES PAID BY COMCAST TO THE
SACRAMENTO METROPOLITAN CABLE TELEVISION COMMISSION

## SUMMARY

Ashpaugh & Sculco, CPAs, PLC (A&S) was engaged by the Sacramento Metropolitan Cable Television Commission, California (SMCTC) to review the franchise and PEG fees paid by Comcast. The review period was from January 1, 2015 through December 31, 2016 (review period).

The purpose of our review was to determine whether Comcast was in conformance with Comcast's state franchise under the Digital Infrastructure and Video Competition Act of 2006 (DIVCA) enacted in California. In accordance with DIVCA, franchise fees are 5.00% of gross revenues and the PEG fee obligation is 1.00% of gross revenues. A&S has identified the total amount due to the SMCTC for underpayment of franchise fees, PEG fees, and interest charges is $588,636.

**TABLE 1**

| Ln No. | Description | Franchise Fees Due to SMCTC | PEG Fees Due to SMCTC | Total Due to SMCTC |
|---|---|---|---|---|
| 1 | Franchise and PEG Fees Calculated by Comcast | $21,320,130 | $4,264,150 | $25,584,280 |
| 2 | California PUC Fees Deducted by Comcast | (60,596) | - | (60,596) |
| 3 | Franchise and PEG Fees Paid by Comcast | $21,259,534 | $4,264,150 | $25,523,683 |
| | Adjustments | | | |
| 4 | Subscriber Revenues | $4,054 | $811 | $4,865 |
| 5 | Late Fees | 36,046 | 7,209 | 43,256 |
| 6 | Insufficient Funds Fees | 11,599 | 2,320 | 13,918 |
| 7 | Multi-Service Fees | 54,763 | 10,953 | 65,716 |
| 8 | Video Installation/Activation | 21,525 | 4,305 | 25,831 |
| 9 | Bad Debt | 31,632 | 6,326 | 37,958 |
| 10 | PEG Fee Revenues | 226,586 | 45,317 | 271,904 |
| 11 | Advertising | 669 | 134 | 803 |
| 12 | Launch Incentives | 4,554 | 911 | 5,465 |
| 13 | California PUC Fees | 60,596 | - | 60,596 |
| 14 | Total Adjustments | $452,025 | $78,286 | $530,310 |
| 15 | Total Amount Calculated by A&S (Ln 3 + Ln 14) | $21,711,558 | $4,342,435 | $26,053,993 |
| 16 | Total Amount Paid by Comcast (from Ln 3) | (21,259,534) | (4,264,150) | (25,523,683) |
| 17 | Amount Due to SMCTC | $452,025 | $78,286 | $530,310 |
| 18 | Interest Charges | 46,639 | 11,686 | 58,326 |
| 19 | Total Amount Due to SMCTC | $498,664 | $89,972 | $588,636 |

**SCOPE OF WORK**

A&S was not engaged to and did not perform an audit of Comcast, the objective of which would be the expression of an opinion that the financial statements provide a representation of the operations for the period reviewed. Accordingly, we do not express such an opinion. Had A&S performed such additional procedures, other matters might have come to our attention that would have been reported to the SMCTC. This report relates only to a review of Comcast's gross revenues used to calculate franchise and PEG fees and does not extend to any financial statements of Comcast or the SMCTC. A&S has relied solely on information provided to us by the SMCTC and Comcast.

A&S reviewed the franchise and PEG fees paid by Comcast to the SMCTC to determine whether Comcast complied with franchise and PEG fee obligations of DIVCA. The analysis was performed solely to assist the SMCTC with respect to evaluating franchise and PEG fees owed by Comcast to the SMCTC for the review period. The conclusions and recommendations are based on data responses, accounting records, and interviews provided by the SMCTC and Comcast. A&S performed the following Scope of Work:

1. Submitted initial data request to Comcast, on behalf of the SMCTC, requesting information for the review period.
2. Reviewed DIVCA, to gain an understanding of the terms, conditions, and requirements for the determination of franchise and PEG fees.
3. Submitted data requests to Comcast to resolve outstanding items and questions.
4. Corresponded with Comcast and the SMCTC's staff, if needed, to obtain additional information.
5. Reconciled the gross revenues reported in franchise and PEG fee payments to supporting data provided by Comcast.
6. Determined whether the categories of revenues were properly included in the calculation of franchise and PEG fees.
7. Summarized the dollar impact of any exceptions.
8. Calculated interest charges associated with the underpayment of franchise and PEG fees.
9. Submitted report to the SMCTC summarizing our findings and recommendations.

**REVIEW OF FRANCHISE AND PEG FEES**

In accordance with the DIVCA, franchise fees are 5.00% and PEG fees are 1.00% of gross revenues, respectively. A&S reviewed the franchise and PEG fees paid by Comcast to the SMCTC for the review period of January 1, 2015 through December 31, 2016. The total amount due to the SMCTC for underpayment of franchise and PEG fees is $588,636. We explain our adjustments and reference them by line number in the remainder of this report, using the same line numbers listed in Table 1 on Page 1.

## ANALYSIS OF SUBSCRIBER REVENUES

Comcast earns the substantial portion of its revenues from cable television subscriber revenues. Cable subscriber revenues include amounts received for programming (basic, digital, high-definition), premium channels, franchise fees, pay-per-view, installation charges, channel guides, equipment lease rentals, late fees, returned check fees and other miscellaneous charges. A&S reconciled the subscriber revenues to the franchise and PEG fee payments, on a test basis, utilizing the same data as Comcast for reporting revenues to the SMCTC.

**Subscriber Revenues (Line 4)**

A&S reviewed the monthly subscriber revenues to determine whether the revenues were correctly included in the gross revenues reported to the SMCTC. Comcast provided us with a detailed reconciliation schedule for December 2015 and December 2016. We used the sample months as guidance to review and reconcile the remaining months, and to determine whether Comcast correctly reported gross revenues to the SMCTC.

Comcast decided to exclude certain subscriber revenues because, in Comcast's opinion, they were not revenues in accordance with the definition of gross revenues. We reviewed the revenues and determined whether they were incorrectly excluded from the gross revenues reported to the SMCTC.

Due to the confidential nature of the subscriber revenues, we have not provided any additional detail in this report. At Comcast's request and the SMCTC's approval, we will submit supporting calculations to Comcast for their subsequent review and discussion.

**Late Fees, Non-Sufficient Funds Fees, and "Multi-Service" Fees (Lines 5-7)**

Comcast classifies the following revenues as "multi-service", i.e., related to more than just video: late fees, non-sufficient funds (NSF) fees, convenience fees, service protection plan fees, administrative fees, and early termination fees. Comcast allocates the "multi-service" revenues based on an allocation factor of video revenues to total service revenues (video revenues divided by the sum of video, high-speed, voice and security revenues). Each of these charges is associated with the bill or the service package and is not related to a line of business (i.e., video, HSD, voice or security). For example, the late fee charged is the same whether the subscriber takes only video or takes multiple services.

Comcast has proposed an argument that, according to generally accepted accounting principles (GAAP), these revenues are "multiple products" and should be allocated. This argument is without merit. None of the late fees, NSF fees, convenience fees and administrative fees are products. As stated above, the fee is the same in every instance when the situation arises, i.e., when the bill is late or the subscriber contacts Comcast, and holds no relationship to any line of business.

We have identified the late fees and non-sufficient funds fees separately in Table 1, as these fees are specifically referred to in the definition of gross revenues under DIVCA. A&S disagrees that the "multi-service" revenues should be allocated and made an adjustment to include 100% of the revenues collected from subscribers in the gross revenues reported to the SMCTC.

**Video Installation/Activation (Line 8)**

Comcast provides customers with an on-time guarantee and gives customers a credit on their bill if Comcast is late or fails to show up for an appointment. Also, if Comcast fails to repair a problem on the first visit and must make repeated trouble calls, Comcast often times gives customers a credit on their bills. Comcast decreased the revenues reported to the SMCTC for credits related to failed on-time guarantees, installations and repairs. It is our opinion that these are business expenses and should not decrease the gross revenues reported to the SMCTC. A&S made an adjustment to reverse the deductions.

**Bad Debt (Line 9)**

Subscriber bad debt reported to the SMCTC should include only actual video write-offs and recoveries. Historically, the CPSM-318 billing reports utilized by Comcast did not provide the breakout of write-offs and recoveries by line of business. Comcast estimated video write-offs based on an allocation of video revenues to total subscriber revenues. Based on our review of the billing reports, A&S noted that the billing reports listed actual bad debt write-offs and recoveries by line of business for the review period. However, the bad debt detail was not accurately reported by line of business. Although we disagree with the Comcast's allocation of bad debt based on revenues, absent a better method supported by data, we recalculated bad debt, net of all adjustments, utilizing an allocation based on billed revenues. A&S made an adjustment to bad debt for the difference in Comcast's estimate of bad debt as compared to our estimate of bad debt.

**PEG Fee Revenues (Line 10)**

Comcast did not include the revenues collected from subscribers related to the pass-through of PEG fees in the gross revenues reported to the SMCTC for the review period. These are revenues received from subscribers and billed on their cable bills. A&S included the amounts collected from subscribers for PEG fees in the gross revenues reported to the SMCTC.

**ANALYSIS OF NON-SUBSCRIBER REVENUES**

Comcast included non-subscriber revenues generated from advertising, home shopping and other revenues. A&S obtained and reviewed the amounts from supporting documentation provided by Comcast. Based on our review, we noted the following exceptions.

**Advertising Revenues (Line 11)**

A&S recalculated advertising revenues and compared the amounts to the advertising revenues reported by Comcast. Comcast reported incorrect advertising revenues to the SMCTC from January through March 2015. A&S adjusted advertising revenues to reflect the revised amounts.

**Launch Incentives (Line 12)**

Comcast received launch incentives from programming suppliers as reimbursement of costs incurred in support of the launch or promotion of new programming. Comcast records launch incentives as "contra-expenses" and does not recognize them as revenues. There is no exclusion of any payments from the definition of gross revenues, as defined in Section 5860(d) of DIVCA.

However, Comcast may deduct from launch incentives associated with "specific, identifiable marketing costs incurred by the holder of a state franchise for the introduction of new programming", as defined in Section 5860(e)(9). If Comcast can provide any specific, identifiable marketing costs, we will review the data to determine whether it is an offset to the launch incentives. A&S made an adjustment to include launch incentives.

**California PUC Fees (Line 13)**

Comcast deducted "California PUC Fees" assessed by the California Public Utilities Commission to holders of state issued franchises from the third quarter franchise fee payments. Based on our review of DIVCA and federal law, we disagree that the California PUC Fees should be deducted from the franchise fee payments. A&S made an adjustment to add back the "California PUC Fees".

**INTEREST CHARGES (Line 18)**

Interest charges are defined in DIVCA, Section 5860, paragraph (h) as follows:

> The state franchise fee shall be remitted to the applicable local entity quarterly, within 45 days after the end of the quarter for that calendar quarter. Each payment shall be accompanied by a summary explaining the basis for the calculation of the state franchise fee. If the holder does not pay the franchise fee when due, the holder shall pay a late payment charge at a rate per year equal to the highest prime lending rate during the period of delinquency, plus 1 percent. If the holder has overpaid the franchise fee, it may deduct the overpayment from its next quarterly payment.

A&S calculated interest charges, compounded annually, for the underpayment of franchise fees utilizing the prime rate plus 1.00%. The prime rate plus 1.00% is shown in the table below. A&S assumed that payment of the outstanding amount would be on April 30, 2018. If payment is after April 30, 2018, additional interest charges will accrue. Interest charges will be recalculated based on when actual payment is expected to be received.

| Period Interest Rate was in Effect | Prime Rate Plus 1.00% |
|---|---|
| January 1, 2015 – December 31, 2015 | 4.25% |
| January 1, 2016 – December 31, 2016 | 4.50% |
| January 1, 2017 – March 31, 2017 | 4.75% |
| April 1, 2017 – June 30, 2017 | 5.00% |
| July 1, 2017 – December 31, 2017 | 5.25% |
| January 1, 2018 – March 31, 2018 | 5.50% |
| April 1, 2018 – April 30, 2018 | 5.75% |

DIVCA does not address the issue of interest charges for the underpayment of PEG fees. Therefore, A&S utilized the language from the California Constitution, Article 15, Section 1, to determine the interest charges associated with PEG fees. A&S calculated interest charges at

7.00%, compounded annually, through April 30, 2018. A&S assumed that payment of the outstanding amount would be on April 30, 2018. If payment is after to April 30, 2018, additional interest charges will accrue. Interest charges will be recalculated based on when actual payment is expected to be received.

**AUDIT FEES**

In accordance with DIVCA, Section 5860(i), "If the examination discloses that the holder has underpaid franchise fees by more than 5 percent during the examination period, the holder shall pay all of the reasonable and actual costs of the examination." The identified underpayment due to the SMCTC from our review did not exceed the 5.00% threshold for the review period. Thus, reimbursement of the audit fee is not included in Table 1.

**RECOMMENDATIONS**

A&S recommends that the SMCTC pursue payment of $588,636 due from Comcast for the underpayment of franchise and PEG fees, including interest charges. Based on our review, it is reasonable to assume that some of the findings noted in this report could apply to franchise and PEG fees paid to the SMCTC in future years. A&S proposes that the SMCTC request that Comcast maintains all relevant financial records in case the SMCTC decides to review additional years later. The financial records should include accounting records, general ledgers, number of subscribers, and data for advertising revenues. It is imperative to maintain these records because clerical errors, changes in accounting methods, or unique situations that would not surface during the year may be discovered under direct questions and analyses.